UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARMEN SMITH : | |
|     Plaintiff : | |
| : | CIVIL ACTION NO. |
| v. : | 3:07-cv-72 (JCH) |
| : | |
| CONTINENTAL AFA, a/k/a : | |
| CONTINENTAL SPRAYERS, : | |
| INTERNATIONAL, INC., ET AL., : | JUNE 4, 2008 |
|     Defendants : | |

**RULING ON DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT [Doc. Nos. 71, 72]**

This is an a hybrid action brought under Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, and the duty of fair representation ("DFR") that has been judicially implied under the National Labor Relations Act (NLRA). Plaintiff Carmen Smith is an hourly employee who works at a manufacturing plant operated by defendant Continental AFA ("Continental"). She is a union member, and her employment at Continental is governed by the terms of the collective bargaining agreement ("CBA") entered into between Continental and defendant IUE-CWA Local 238, AFL-CIO ("the Union").[1]

Smith alleges that Continental breached the CBA when it refused to let her apply for a position as a Quality Assurance Lab Technician. Smith also alleges that the Union breached its duty of fair representation when it failed to process her grievance against

---

[1] While the local union is named as a defendant, Smith named the international union, IUE-CWA, AFL-CIO, as a defendant as well. The international union has not argued that it ought to be treated differently from the local union for purposes of the instant summary judgment motion. For the sake of simplicity, the court will therefore refer to both union defendants as "the Union."

1

the company.  The defendants have each filed a Motion for Summary Judgment.  See Doc. Nos. 71, 72.  For the reasons that follow, the court **DENIES** the Motions.

I.  STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in her favor in order to defeat the motion.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## II.    FACTUAL BACKGROUND[2]

In 1986, Smith began working at a manufacturing plant in Bridgeport. At the time, the facility was owned by Specialty Packing, Inc. Smith Aff. ¶ 3. Continental purchased the facility in 2003, and it has continued to operate the plant through the present date.

Smith has worked continually at the plant since 1986. During this long tenure, she has held a variety of positions, in a variety of departments. For example, Smith has done inspecting and auditing work, quality assurance work, machine operation work, and document control work. Id. ¶ 4. Currently, Smith works in the quality assurance department as a molding auditor. Id. ¶ 5. She usually works on the second shift, which means that her position requires some nighttime work; the first shift is considered more desirable because it entails only daytime work. Id. ¶¶ 5, 24-25.

Before 2006, the position of Quality Assurance Lab Technician was held by Gladys Marin (formerly Gladys Castillo). Id. ¶ 8; Plaintiff's Exh. B. Marin was a salaried non-union employee, and hence the terms of her employment were not governed by the CBA. However, in 1993 the Union and Continental's predecessor entered into a formal agreement to convert Marin's position into an hourly union job. That conversion would take effect once Marin permanently left her job, although the plant operator would be permitted to use hourly employees to fill in for Marin when she had temporary absences. Plaintiff's Exh. B. During the years that followed, Smith was usually the

---

[2] For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the plaintiff where there is evidence to support her allegations.

employee who filled in for Marin when Marin was temporarily unavailable.  Smith Aff. ¶ 8.

Marin retired in August 2006.  About a month or two before Marin left Continental, plant manager Bradford Smythe scheduled a meeting with plant employees Richard Johnson and Elsie Almeida, so that the three could discuss Marin's impending retirement.  Smythe Dep. at 40.  At the time, Johnson and Almeida were, respectively, the President and Vice President of the local Union.  This meeting was not unusual, as Continental officials would regularly meet with the President and Vice President of the local Union when jobs became vacant and were going to be offered to Union members. Johnson Dep. at 18; Continental's 56(a)(1) Stat. at ¶ 32; Plaintiff's 56(a)(2) Stat. at ¶ 32.

Emma Wheway, from Human Resources, also attended the meeting.  Wheway opened by informing Johnson and Almeida that Marin's position was becoming vacant, and that pursuant to the CBA, it was going to be "posted" for the general Union membership.  Johnson Dep. at 19.  This meant that all Union members at the plant would have three days to sign a form indicating their interest in being considered for the position.  Plaintiff's Exh. C at 21.  The job would then be awarded to the bidding employee with the most seniority, so long as that employee was qualified to perform the job.  Id. at 21-22.  It is standard practice for vacant positions at Continental to be posted.  Johnson Dep. at 18.

Immediately after Wheway expressed her intent to post the position, Almeida objected and argued that she was entitled to Marin's job.  Almeida explained that back in 1997, she had successfully obtained the position of Functional Testing Lab Technician.  In that capacity, she had performed work that was very similar to Marin's,

although Almeida performed this work on the second shift, and as an hourly employee. Smith Aff. ¶ 23; Smythe Dep. at 30, 45-46. Some time later, when the plant eliminated Almeida's position as a Functional Testing Lab Technician, Almeida then exercised her rights under the CBA to "bump" out a less senior employee in a different department, and assume that employee's job on the production floor. Smith Aff. ¶ 23. In Almeida's view, because of this history, she retained "recall rights" under the CBA which permitted her to automatically assume Marin's job.

After hearing Almeida's explanation, and after reviewing documentation that Almeida submitted, Smythe was unsure how to proceeded. Smythe Dep. at 47-48. In his experience, the company posted "just about everything," id. at 47, and so he was initially a bit uncomfortable with the idea of just awarding the position to Almeida. Id. He asked Johnson to solicit the opinion of the representative from the international union; that person appears to have confirmed that Almeida was entitled to Marin's job. Id.; Johnson Dep. at 23. Ultimately, the Union and Continental came to agree that Almeida had "recall rights" under the CBA which entitled her to Marin's position. Plaintiff's Exh. D.

Word of this decision was slow to trickle down to plant employees, and the Union did not even initially inform plant employees about Marin's impending retirement. Smith Aff. ¶ 9. Word nonetheless got around, and at some point in July 2006, Smith decided to speak to her supervisor, Bruce Wilkes, to ask him about posting for Marin's position. Id. ¶ 10. Wilkes told Smith that the position would not be posted, and he suggested that she contact the Union for more information. Id. Smith also spoke to Smythe about the situation, and he too encouraged her to talk to the Union. Id. ¶ 11.

5

Smith next spoke with Johnson. Id. ¶ 12. Johnson initially responded by saying that there was no need for a meeting, but after Smith explained how she had been referred to him by Smythe, Johnson said he would get back to her. Id. When Johnson did not get back to her after two days, Smith took it upon herself to contact Ed Oakley, the representative from the international union. Id. ¶ 13; Smith Dep. at 47.

On July 18, 2006, before Smith had heard back from Oakley, the company and the Union posted a joint notice to employees regarding Marin's position. Smith Aff. ¶¶ 14-15; Plaintiff's Exh. D. The notice explained that the job would not be posted because Almeida had recall rights under the CBA. Plaintiff's Exh. D.

A number of employees were upset by this. On July 21, 2006, approximately 25 employees submitted a grievance form, signed by a Union steward, in which they alleged that Continental violated the CBA by failing to post for Marin's replacement. As their principal argument, the employees claimed that Marin's retirement had created a "new" position because it had not previously been a Union position; the employees implied that recall rights were therefore inapplicable. Plaintiff's Exh. E. The grievance did not suggest, in any manner, that Almeida lacked recall rights because she was still a plant employee. See id. Smith was one of the employees who signed the grievance. Id.

Johnson received this grievance, but he did nothing to help advance it. Johnson Dep. at 31-32. According to Johnson, the grievance had not been properly filed because it had not been reviewed by him; he thus deemed this "grievance" to actually be a "petition." Id.; Smith Dep. at 86. As Johnson later acknowledged, there is nothing in the CBA that requires a grievant to seek the Union President's signature before

6

submitting a grievance. Johnson Dep. at 31-32. However, it was Johnson's apparent belief that "past practice" at the local union had imposed this requirement. Id. According to Johnson, because he had not reviewed the grievance prior to it being submitted, he saw no reason to actually read the grievance. See id. at 48-49.

Although Johnson did not deem the grievance to be validly filed, and he declined to read the grievance, he did take further action to attempt to respond to employee concerns. On the same day that the grievance/petition was submitted, Johnson posted a responsive memorandum on the plant's bulletin board. The memorandum stated:

> In response to the petition presented to the Union - if any
> union member has any proof that the decision made was
> wrong between the company and the union please bring you
> [sic] information to the management and union why you
> disagree. Otherwise if there is no proof the decision stands.

Plaintiff's Exh. F. Smith never submitted any information to either the Union, or to the company, in response to this posting. Smith Dep. at 87-88; Continental's 56(a)(1) Stat. at ¶ 45; Plaintiff's 56(a)(2) Stat. at ¶ 45.[3]

Smith was subsequently contacted by Oakley. Smith Aff. ¶ 15. Oakley explained that, while he had not yet heard from Johnson, he did not think a meeting was needed to discuss Marin's job. Id. But after Smith relayed the contents of her prior discussion with Smythe, and after Smith explained the extent of employee discontent at the plant regarding the Union's decision, Oakley reconsidered. Id. Accordingly, the

---

[3] In her Rule 56(a)(2) Statement, Smith claims that she did in fact present a copy of the CBA, as well as a copy of the 1993 agreement, in response to the posting. However, to support that claim, Smith merely cites the copies of the 1993 agreement and CBA that are in the record; she cites to absolutely no evidence to support her assertion that she in fact presented these documents in response to Johnson's posting. See Plaintiff's 56(a)(2) Stat. at ¶ 45; Plaintiff's Exh. B; Plaintiff's Exh. C.

7

Union organized a meeting, which was held at Almeida's church on July 27, 2006. Id. at ¶ 16; Smith Dep. Exh. 2 at 27; Continental's 56(a)(1) at ¶ 46; Plaintiff's 56(a)(2) at ¶ 46.[4] Almeida, Johnson, and Oakley attended, as did a union steward and a union lawyer. Smith Aff. ¶ 16. A number of employees, including Smith, also attended. Id. The meeting was contentious, and there was yelling between the rank-and-file Union members and the Union's officers. Id. ¶ 17. The matter was not resolved to everyone's satisfaction. Id.

On August 2, 2006, several Union members requested, in writing, that the Union process their grievance by taking it to arbitration. Id. ¶ 20; Plaintiff's Exh. H. In their written submission, the union members generally invoked the CBA provisions about job postings, and they pointed out that Marin's job was in the unique situation of being a salaried position that was converting to a union position. Plaintiff's Exh. H.

Notwithstanding the August 2, 2006 submission, the Union refused to take the matter to arbitration. Smith Aff. ¶ 20. As Johnson recounted it, because the request for arbitration was not signed by a Union steward (and indeed had no signatures on it at all), Johnson neither read the request for arbitration, nor processed it. Johnson Dep. at 51-52. However, nothing in the CBA states that a request for arbitration needs to be signed by a steward.

---

[4] Through her Rule 56(a)(2) statement, plaintiff disputes that the meeting took place on July 27, and she maintains that it actually took place on July 21. See Plaintiff's 56(a)(2) Stat. at ¶ 46. However, the evidence plaintiff cites merely says that the meeting took place in "July 2006," and does not offer a specific date. See id. (citing Smith Aff. ¶ 16). As the defendants have presented evidence to show that the meeting took place on July 27, see Smith Dep. Exh. 2 at 27, and as the plaintiff has offered nothing to refute that, the court deems the meeting to have taken place on the July 27.

Had the job been posted, rather than simply awarded to Almeida, the job would have gone to Smith as the qualified individual at the plant with the most seniority. Accordingly, on January 16, 2007, Smith filed the instant action against Continental and the Union. In her Complaint, Smith asserted a hybrid Section 301/duty of fair represenation claim. See Doc. No. 1. The defendants have filed Motions for Summary Judgment.

## III.   ANALYSIS

Because the plaintiff is advancing a hybrid Section 301/duty of fair repsentation claim, the plaintiff is actually advancing two claims simultaneously. Section 301 of the LMRA provides a cause of action for breach of a collective bargaining agreement. See 29 U.S.C. § 185(a). Accordingly, under Section 301, Smith alleges that her employer has breached the CBA. However, because Smith's grievance was not arbitrated as provided in her collective bargaining agreement, the employer would normally be able to defeat the claim by arguing that Smith had failed to exhaust her grievance and arbitration remedies. See Del Costello v. Intl. Bhd. of Teamsters, 462 U.S. 151, 163-65 (1983). To avoid that problem, Smith therefore invokes the second half of her claim, and she argues that the Union thwarted her ability to invoke the grievance and arbitration proceedings, in violation of the Union's duty of fair representation. See id.; see also Vaca v. Sipes, 386 U.S. 171, 185-86 (1967).

In a hybrid Section 301/duty of fair representation claim, the plaintiff can choose to name both the employer and the union as defendants, or only one of the two. Del Costello, 462 U.S. at 165. Regardless of who is named a defendant, however, the

9

plaintiff cannot succeed unless she makes three showings. First, the plaintiff must prove that the employer in fact breached the CBA. White v. White Rose Food, 237 F.3d 174, 178 (2d Cir. 2002). Second, the plaintiff must show that the Union breached its duty of fair representation. Id. Finally, the plaintiff must show that there is a causal connection between the Union's wrongful conduct and any injuries that she suffered. Spellacy v. Airline Pilots Assoc.-Intl., 156 F.3d 120, 126 (2d Cir. 1998).

A. The CBA

In arguing that they correctly interpreted the CBA, defendants focus on Section 12.06(A). That section states:

> When additional employees are needed in the plant, employees with recall rights shall be recalled to jobs in the unit from which they were laid off in order of plant seniority, provided the employee is qualified to perform the available job in a satisfactory manner. Employees on layoff shall have the right to refuse recall if the job is not on the shift from which they were laid off. When recalled, the employee shall start with the same amount of seniority as he had at the time of layoff plus such time as he has been on the recall list.

Plaintiff's Exh. C at 20.[5]

The plaintiff, for her part, does not believe that the recall provision applies to Marin's position. Plaintiff's Objection at 13. Specifically, because Marin's position as a

---

[5] Curiously, the agreement does not actually define the term "recall rights" or definitively say who has these rights. There is an opaque reference in the agreement to "the layoff and recall procedure," Plaintiff's Exh. C at 20, although this phrase does almost nothing to define how the procedure actually works. Another somewhat opaque provision notes that when an employee is recalled "the employee shall start with the same amount of seniority as he had at the time of layoff plus such time as he has been on the recall list." Id. A third provision allows that employees "on layoff shall have the right to refuse recall if the job is not on the shift from which they were laid off." Id. Aside from these provisions, however, recall rights are largely unexplained in the agreement.

Quality Assurance Lab Technician differed slightly from Almeida's position as a Functional Testing Lab Technician, Smith believes that Almeida could not have recall rights to Marin's job.

Smith also makes a second argument, relying on Section 13.01 of the CBA. That section provides: "When permanent, additional or replacement employees are required on a shift in any unit, the job shall be posted for a period of three (3) working days and will be awarded to the most senior, qualified bidder." Id. In Smith's view, this provision means that all jobs must be posted. Plaintiff's Objection at 12-13.[6]

In interpreting the CBA, the court must be guided by traditional contract rules of interpretation, so long as those rules are consistent with federal labor policy. Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp., 230 F.3d 569, 576 (2d Cir. 2000). Unambiguous terms must be given effect as written, but when terms are ambiguous, the court may examine extrinsic evidence. Id. Additionally, when terms of a contract are ambiguous, the meaning of the contract may become an issue of fact. See Palmieri v. Allstate Ins. Co., 445 F.3d 179, 187 (2d Cir. 2006).

The court deals first Smith's argument that Almeida lacked recall rights because of differences between Marin's job, and the job that Almeida was laid off from. See Plaintiff's Objection at 12-14. To make this argument, Smith stresses that Marin had been a non-union salaried employee, working on the first shift, and had the job title of Quality Assurance Lab Technician. Almeida, however, had been a hourly union

---

[6] Smith also has a third argument in which she claims that recall rights can only belong to employees on layoff status, and do not belong to employees still working at the plant. The court finds it unnecessary to address this argument in order to resolve the instant motion.

11

employee, working on the second shift, and she held the title of Functional Testing Lab Technician.

Smith's argument erroneously assumes that an individual can only use recall rights to return to a position that is identical to the one the individual was originally fired from. However, the CBA expressly contemplates that employees can have recall rights to a job on a shift that <u>differs</u> from the one they were laid off from. See Plaintiff's Exh. C at 20 ("Employees on layoff shall have the right to refuse recall if the job is not on the shift from which they were laid off."). More generally, the CBA specifically states that an employee with recall rights will be recalled to a job within the same <u>unit</u> from which she had been laid off; it does not say that employees will be recalled to the same <u>job</u> from which they had been laid off. See id. (explaining that "employees with recall rights shall be recalled to jobs <u>in the unit</u> from which they were laid off" (emphasis added)).[7]

Nor does it matter in this case that the job opening was created by the conversion of a salaried position to a union position. Under the CBA, an employee with recall rights shall be recalled "[w]hen additional employees are needed in the plant." Id. The CBA does not differentiate between job openings that come about due to salaried workers' retirements, and other job openings.

Accordingly, insofar as Smith argues that recall rights did not specifically apply to Marin's position, Smith's hybrid claim fails because she cannot prove a breach of the CBA.

---

[7] Both the Functional Testing Lab Technician job, and the Quality Assurance Lab Technician job, are in the same unit because they both in Quality Assurance. See Plaintiff's Exh. C at 18 (defining "Quality Assurance" as a unit within the plan).

Smith fares better with her second argument. As Smith reads the CBA, posting is required for <u>all</u> positions, even positions that might be subject to recall rights. That interpretation is sound because the language in the CBA is absolute: "When permanent, additional or replacement employees are required on a shift in any unit, the job opening shall be posted for a period of three (3) working days and will be awarded to the most senior, qualified bidder." Plaintiff's Exh. C at 21. Tellingly, this provision makes no exception for situations where an employee asserts that she has recall rights.

One might argue that Section 12.06(A) contains similarly mandatory language, and that it therefore requires an employee to be restored to her prior unit when a vacancy arises. But that interpretation is flawed, for two reasons.

First, this recall provision does not actually state that an employee must be returned to her former position when a vacancy arises. Instead, an employee must be recalled to a position only if she possesses "recall rights." Accordingly, the real question is whether the phrase "recall rights" encompasses the right to trump otherwise applicable provisions that mandate that a job be posted.

Unfortunately, the agreement is not crystal clear on this issue, as it fails to expressly define the term "recall rights." Still, there are indications in the CBA that an employee cannot use recall rights to prevent a job from being posted. Section 13.03 deals with the scenario in which a vacancy becomes available, but no qualified employees bid for the job. It states: "If there are no employees who have exercised their seniority rights or none are eligible due to fitness or ability to fill a permanent vacancy, the company may fill such vacancy by transferring, or if there is no qualified person with recall rights, by hiring." By its terms, Section 13.03 contemplates that the

13

company will utilize recall procedures as a <u>last resort</u> before it hires more people, rather than as a <u>first resort</u> before posting an available position.

Moreover, the recall provision that the defendants rely on (Section 12.06(A)) itself states that employees shall be recalled "in order of plant seniority." This could suggest that the recall provisions are designed to integrate with the regular seniority provisions, rather than override them.

Of course, one could instead interpret Section 12.06(A) to mean that seniority simply acts as a tiebreaker when deciding among employees with recall rights. Under this interpretation, one could still think that employees with recall rights will obtain a job preference over all other employees, irrespective of seniority. Yet this interpretation would lead to a direct conflict with the unqualified language of the seniority provision. Reading the document as a harmonious whole, it makes much more sense to read the recall provision as complying with the general seniority principle: the company must post an available job, and if that position remains unfilled, the company may then turn to the recall list and recall the employee on that list with the most plant seniority.

Admittedly, there is some evidence that the company has never actually interpreted the agreement this way. Smythe testified that, as a matter of course, the company tries to fill a position from the recall list before it posts the position and awards it based on seniority. <u>See</u> Smythe Dep. at 26-27.

As an initial matter, however, it is not apparent that the court may look to this extrinsic evidence, as the CBA seems relatively clear in prioritizing the seniority principle over recall rights. In any event, looking at this evidence, the court concludes that there is a disputed issue of material fact regarding the correct interpretation of the CBA.

Indeed, in other deposition testimony, Smythe recounted how he was initially unsure whether to award Almeida the job, and he explained that the company posts just about everything. Smythe Dep. at 47-48. This latter course of performance could be inferred to support Smith's interpretation of the CBA, rather than Continental's. When this evidence is coupled with the terms in the CBA that favor Smith's interpretation, and with the court viewing the evidence in the light most favorable to Smith, the court concludes that the correct interpretation of the CBA depends on issues of fact that must be resolved at trial. Defendants are not entitled to summary judgment on the basis of their contract interpretation.

B.     The Duty of Fair Representation

Even if Smith survives summary judgment with regard to her interpretation of the CBA, she must also demonstrate that there are disputed issues of material fact with regard to her DFR claim against the union. She has done so.

A union breaches its duty of fair representation "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca, 386 U.S. at 190. This standard is deferential towards unions, and it recognizes that they must be given a significant degree of latitude in order to perform their role effectively. Spellacy, 156 F.3d at 126. Mere failure to process a meritorious grievance, without more, is insufficient to constitute a breach of the Union's duty. Vaca, 386 U.S. at 192-93.

Smith claims that the Union's actions were taken in bad faith or were arbitrary. "A union acts in bad faith when it acts with an improper intent, purpose, or motive." Spellacy, 156 F.3d at 126. Generally, bad faith conduct refers to such intentionally

15

misleading actions as fraud and dishonesty.  Id.  A court confronted with a claim of bad faith must examine whether "the union took a position on the basis of an informed, reasoned judgment regarding the merits of [the plaintiff's] claim in light of the language" in the CBA.  Id. at 127.  A union acts arbitrarily when its actions are so unrelated to union members' interests, and so egregious, that the union's conduct can be said to be irrational.  White Rose Foods, 237 F.3d at 180-81; Cruz v. Local Union No. 3, 34 F.3d 1148, 1153 (2d Cir. 1994).  An unexplained failure to investigate the merits of a grievance can constitute arbitrary conduct.  See Cruz, 34 F.3d at1153-54.

In this case, a reasonable jury could conclude that the Union acted arbitrarily when it declined to pursue Smith's grievance.  If Johnson had actually considered the merits of the grievance, and had simply disagreed with Smith's interpretation of the CBA, such a decision might be entirely nonarbitrary and sustainable.  But a reasonable jury could conclude that Johnson never considered the merits of Smith's grievance at all, and that he instead arbitrarily declined to process the grievance for made-up reasons.

Johnson nonetheless maintained that the grievance was improperly filed because he had not himself approved it.  Admittedly, there is nothing arbitrary about a Union giving its President the authority to determine which grievances to prosecute, and which to leave by the wayside.  But it is arbitrary and irrational for Johnson to ignore the grievance on the ground that he had not yet reviewed it, and then proceed to decline to review it.  See Cruz, 34 F.3d at 1153-54 (finding that a union acted arbitrarily when the union refused to investigate or review a submitted grievance).  Johnson essentially trapped Smith in a catch-22.  Tellingly, Johnson never attempted to even advise Smith

and other employees of how they could cure the alleged procedural defects in their submissions to the Union. See Johnson Dep. at 53-54.

    C.    <u>Causation</u>

The defendants briefly suggest that Smith cannot demonstrated a causal link between her injuries and any unfair labor practices caused by the Union. This argument is easily rejected. In her Affidavit, Smith states that, because the Union prevented her from obtaining the Quality Assurance Lab Technician job, she has become emotionally upset and distressed. Smith Aff. ¶ 25. She also alleges that she has been precluded from obtaining the additional job security that comes with that job, which has caused further emotional injury to her during the layoffs and reorganizations in which she felt her job was less secure. Id. Finally, a jury could conclude that Smith has been injured by having to work on a less desirable shift. See id. ¶ 24. This is sufficient to create an issue of fact on causation, avoiding summary judgment.

## IV.    CONCLUSION

The defendants' Motions for Summary Judgment [Doc. Nos. 71 and 72] are **DENIED**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 4th day of June, 2008.

                                                /s/ Janet C. Hall
                                             Janet C. Hall
                                             United States District Judge